[No. 7802.]

THE PEOPLE EX REL V. PREVOST ET AL.

1.  CONSTITUTIONAL LAW—*Construction of the Constitution.*  Where the language of the Constitution is plain and unambiguous there is no room for construction.

2.  ——*Amendments—Presumptions*—It is a universal rule that where an amendment to the constitution which has received the popular approval is assailed, it must appear beyond a reasonable doubt, both as to law and fact, that the constitution has been violated before the amendment will be overthrown.

3.  ——*Submission of Separate Amendments*—The proviso to section 2 of article XIX only requires that each proposed amendment shall be submitted separately.  Several provisions constitute a single amendment if each is so connected with the general subject that one is not

desirable without the other. That other articles may be incidentally affected, or amended by implication is not material. *People v. Sours*, 31 Colo. 369, 74 Pac. 167, followed.

4. ——*Statute Proposed as to Publication of Initiated Laws*— The legislation submitted to the people, under the Initiative, at the election of November, 1912, relating to the publication of initiated laws, being proposed as a statute, and voted upon as such, is to be regarded as attempted legislation, and not as an amendment to the constitution, even though the effect proposed was to change the rule prescribed by section 2 of article XIX.

5. ——*Initiative—Statute Proposed contravening the Constitution*—A measure which, while in form, and to all indicated purposes is a statute, contravenes the constitution, is not to be regarded as an amendment to the constitution, but is itself unconstitutional.

6. ——*State Wide Prohibition—Proposed Amendment For*—The measure proposed under the initiative, and submitted to the people as a new article of the constitution, No. XXI at the election of 1912, and commonly known as the "State Wide Prohibition Amendment," would not, if adopted by the general assembly, in the same words proposed to the people, have contravened any provision of the constitution, nor amended any article thereof. Therefore it is not to be regarded as an amendment to article XVIII.

7. ——*Amendment to Article XX*—The measure submitted to the people under the initiative, at the election of 1912, as an amendment to article XX of the constitution (laws 1913), commonly known as the Home Rule Amendment, was a valid and effectual amendment to the fundamental law. (1) When proposed, amendments had been offered to but five articles of the constitution. (2) Under section 1 of article V there is no limitation to the number of amendments which may be submitted to the people, under the initiative, at one election. The wisdom or policy of this reservation of an unlimited power in the people to change the fundamental law is a political question, and not for the courts; and the courts can not assume that this power in the people will be abused. (3) The provisions of section 6 of the article as amended, are effectual to make the regulation of municipal elections, the levy and collection of taxes for municipal purposes, and special assessments, matters of municipal concern. All the provisions of the amendment are germane to its general purpose, and it was properly submitted as a single amendment.

8. *Judicial Power—Abuse of*—It is quite as important that the power of the courts, as those of the legislative and executive departments, should be exerted within the limits imposed by the constitution.

*Error to Pueblo District Court.*—Hon. J. E. RIZER, Judge.

. Mr. WALTER N. DIXON, for plaintiff in error.

Messrs. ADAMS & GAST, Mr. ROBERT COWLES, for defendants in error.

Messrs. YEAMAN & GOVE, *Amici Curiae.*

CHIEF JUSTICE MUSSER delivered the opinion of the court:

The plaintiff in error brought an action in the nature of *quo warranto* to test the validity of the charter of the city of Pueblo, claimed to have been framed and, on September 19, 1911, adopted by the electors, pursuant to the provisions of section 6 of article XX of the Constitution, as that section existed at that time. By this charter, commission form of government was provided for the city. A general demurrer was sustained to the complaint, and, the plaintiff not pleading further, the action was dismissed at his costs. It is to review this judgment and the action of the court in sustaining the demurrer that this writ of error is prosecuted.

The discussion, which will now determine this case, makes it unnecessary to state the contents of the complaint or to discuss the alleged defects which it was therein alleged and claimed rendered the charter void. After the judgment, and at the general election in November, 1912, the people of this state adopted an amendment to section 6 of article XX of the constitution, which is popularly called "The Home Rule Amendment," and which was proposed under the initiative and referendum provisions contained in section 1 of article V of that instrument. It was conceded at the oral argument, and it is undoubtedly true, that if the so-called "Home Rule Amendment" was legally proposed and adopted, so that it became a valid part of the constitution, the alleged defects in the charter and government of the city have been cured, if they ever existed, and that, therefore, the judgment must be affirmed.

It appears that there were a number of constitutional amendments, proposed by the general assembly, and under the initiative, that were submitted to the people and voted upon at the election in November, 1912. In addition to the Home Rule Amendment to section 6 of article XX, another amendment to that article was proposed and voted upon. It is claimed that amendments to ten articles, in all, were proposed, by the general assembly in part, and under the initiative in part, filed in the office of the secretary of state and voted upon, and that amendments to at least six articles had been so filed before any proposed amendment to article XX appeared. It seems to be the position of the plaintiff in error, that, when proposed amendments to six articles, whether all were proposed by the general assembly, or all by the initiative, or in part by the one method and in part by the other, have been filed in the office of the secretary of state for submission to the people, any amendment to any article other than one of the six already affected, thereafter filed, would be a nullity even though submitted to the people and by them adopted at the election. It is claimed that this result is brought about by section 2 of article XIX of the constitution, and section 1 of article V thereof. Section 2 of article XIX provides that the general assembly may propose any amendment or amendments to the constitution, and for the manner of their proposal, publication, and their submission to the qualified electors of the state for approval or rejection, and closes with a proviso that if more than one amendment be submitted at any general election each shall be voted upon separately and the votes thereon cast separately counted, and then ends with this sentence: "But the general assembly shall have no power to propose amendments to more than six articles of this constitution at the same session." Section 1 of article V, which contains the initiative and referendum provisions,

so far as it can have any bearing upon any question in this discussion, is as follows:

"Section 1. The legislative power of the State shall be vested in the General Assembly consisting of a Senate and House of Representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the General Assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the General Assembly.

The first power hereby reserved by the people is the initiative, and at least eight per cent. of the legal voters shall be required to propose any measures by petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions for State legislation and amendments to the Constitution, shall be addressed to and filed with the Secretary of State at least four months before the election at which they are to be voted upon.

The second power hereby reserved is the referendum, and it may be ordered, except as to laws necessary for the immediate preservation of the public peace, health or safety, and appropriations for the support and maintenance of the department of state and state institutions, against any act, section or part of any act of the General Assembly, either by a petition signed by five per cent. of the legal voters or by the General Assembly. * *

* * The veto power of the Governor shall not extend to measures initiated by, or referred to the people. All elections on measures referred to the people of the State shall be held at the biennial regular general election, and all such measures shall become the law or a part of the Constitution, when approved by a majority of the votes cast thereon, and not otherwise, and shall take effect from and after the date of the official declaration of the

vote thereon by proclamation of the Governor, but not later than thirty days after the vote has been canvassed. This section shall not be construed to deprive the General Assembly of the right to enact any measure.  * *

The Secretary of State shall submit all measures initiated by or referred to the people for adoption or rejection at the polls, in compliance herewith.''

Whenever a constitutional amendment is attacked on account of some alleged violation of the constitution in its submission, it is a universal rule that it must appear beyond a reasonable doubt, both as to law and fact, that the constitution has been thus violated before the amendment will be overthrown. *People v. Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34. Even were the law with respect to amendments to six articles, as the plaintiff in error claims it is; that is, that when amendments to six articles have been filed an amendment to another article thereafter filed is void (which we do not concede), he has not made it appear beyond a reasonable doubt that such a law was violated in the submission of the Home Rule Amendment. In order to arrive at that conclusion, he contends that a statute relating to the publication of initiated laws, which was itself initiated and voted upon at the election in November, 1912, was a constitutional amendment, though in form a statute. This measure was initiated as a statute and submitted and voted upon as such. There was nothing in or about it that in any manner indicated that those who had initiated it or the people who voted upon it, had a thought or a suspicion that it was a constitutional amendment or intended for one. At the same election there was submitted a constitutional amendment amending the section relating to the publication of constitutional amendments and the statute evidently was framed and voted upon with the idea in mind that the constitutional amendment would be adopted. The plaintiff in error asserts that the publica-

tion of constitutional amendments was controlled by the constitution, and that the statute would have been unconstitutional as such. After claiming that the statute would have been unconstitutional if adopted, he contends that the measure, though to all other appearances and indications a statute, was in fact a constitutional amendment. Reduced to its last analysis, the argument is this: If an initiated measure contravenes the constitution, though it is in form a statute, professedly intended as such with nothing about it to indicate that it was intended for a constitutional amendment, nevertheless it is a constitutional amendment. Such a position cannot be maintained in reason or logic. To say that the people could thus, without intending to do so, and unwittingly, amend their constitution, is a proposition that carries with itself its own refutation. The only reasonable thing that can be said of a measure that in form and to all indicated intents and purposes is a statute which contravenes the constitution, is, not that it is a constitutional amendment, but that it is itself unconstitutional.

It is further said in the brief of the plaintiff in error: "If we eliminate the so-called statute, the effect of which is to amend article V, there were filed amendments to six articles, to-wit: * * * before any amendment was proposed to article XX." In arriving at this conclusion, he maintains that a proposed new article, to be numbered XXI, and popularly called "the state wide prohibition amendment," was in fact an amendment to article XVIII. The proposed article XXI prohibited the manufacture in or importation into this state of any intoxicating liquors for sale or gift and prohibited the sale or keeping for sale of any intoxicating liquors, but provided that the handling of intoxicating liquors for medicinal or sacramental purposes might be provided for by statute. Article XVIII is captioned "miscellaneous" and consists of eight

different sections bearing no particular relation to each other.

If we understand the plaintiff in error aright, his argument seems to be that after the constitution was first adopted no new articles could be added, but that any proposed new article that was germane to any of the matters in any of the articles other than article XVIII became a part of the article to which it was germane, and if it was not germane to any of the other articles then it became a part of article XVIII. He has not called our attention to any authorities to sustain this position and we know of none. On the contrary, the case of *People v. Sours, supra,* is directly against it. He contends secondly, that because section 5 of article XVIII commands the general assembly to prohibit by law the manufacture in or importation into this state and the sale of spurious, poisonous or drugged spirituous liquors, or spirituous liquors adulterated with any poisonous or deleterious substance, the prohibition amendment was clearly an amendment by addition to article XVIII. He cites no authorities to support this contention, but contents himself with its mere assertion. In the case of *Schwartz v. People,* 46 Colo. 239, 104 Pac. 92, it was contended that on account of the presence of section 5 of article XVIII in the constitution, the general assembly had no power to legislate with respect to any liquors but such as were therein mentioned. This court, however, did not accept that theory. On the contrary, it held that no one ever had an inherent, natural or common law right in Colorado to carry on the business of dealing in intoxicating liquors, and on page 250 it was said:

"It must therefore be accepted, beyond chance of controversy, that the legislature of Colorado has the full right and power by law, to provide such ways and means to prohibit and suppress the sale of any kind of intoxicating liquors as it may see fit, and as the exigencies of the

case seem to it to require and demand, unless by express constitutional inhibition, or *necessary* implication, that right and power has been withdrawn."

From this it is clear that if the general assembly of Colorado would have enacted as a statute the state wide prohibition amendment in its very words, such statute would not have contravened the constitution of Colorado or any article or section thereof. If as a statute it would not have been contrary to any article of the constitution, how can it be said that as a constitutional amendment it would have amended any article? The plaintiff in error could have argued that the state wide prohibition amendment would have been an addition to our bill of rights as well as to argue that it would have been an addition to article XVIII. Eliminating the statute which plaintiff in error claims was a constitutional amendment, and which has been shown was not such, the most that is asserted in the brief of plaintiff in error, or in any other brief contending for the invalidity of the Home Rule Amendment, is that when the first proposed amendment to article XX was filed with the secretary of state, there were then already filed amendments to six articles, and this conclusion is arrived at by saying that the state wide prohibition amendment was an amendment to article XVIII. It is in this manner that it is attempted to demonstrate, beyond a reasonable doubt, that the constitution was violated in the submission of the Home Rule Amendment. We have a right to assume that the utmost has been contended for that the conscience of the plaintiff in error or counsel would permit them to contend for.

If we were to adopt the conclusions as to fact and law with reference to the filing of amendments as claimed by plaintiff in error, except with respect to the proposed statute and that the prohibition amendment was an amendment to article XVIII, it appears that when the first proposed amendment to article XX was filed in the

office of the secretary of state there had been filed in that office amendments to but five articles of the Constitution. Such is the fact, for excluding the said proposed statute and the prohibition amendment, the amendments filed, proposed by the general assembly and by the initiative, to and including the first proposed amendment to article XX were as follows: Two amendments to article X; two, to article XI; two, to article XIV; one, to article XV; one, to article XIX, and one, to article XX. The last was filed on June 29, 1912, at 11 o'clock a. m. instead of 11:30 as inadvertently said by plaintiff in error, and was an amendment to section 7. The Home Rule Amendment was filed the last of all the proposed amendments, and, as has been seen, is an amendment to section 6 of article XX. The prohibition amendment was proposed under the initiative provisions of the constitution and not by the general assembly. The plaintiff in error includes it in his enumeration as an amendment to article XVIII which it plainly was not, nor was it an amendment to any other article by implication or otherwise. The limitation in section 2 of article XIX extends only to amendments to articles, which is recognized by plaintiff in error when he insists that the prohibition amendment was an amendment to article XVIII. A grave doubt has thus arisen as to the existence of the principal and necessary fact upon which the whole argument of plaintiff in error must rest. It is not necessary to resolve or remove this doubt since a majority of the court thinks that the plain language of section 1 of article V is against the contention of plaintiff in error no matter what the true meaning of section 2 of article XIX may be, and places the determination of this case solely on that language.

Before we discuss this, however, we deem it necessary to exclude from applicability in this case a certain argument made by plaintiff in error, in which he asserts that if the limitation of the right granted to the general

assembly in section 2 of article XIX to propose constitutional amendments is not extended to such proposal by the initiative, then the limitations upon the general assembly to enact laws are not applicable to such enactment under the initiative and referendum. We think that the necessary premises and logical discussion of these two questions are so different that the determination of the one is not determinative of the other. The one relates to a limited right with reference to a detail of procedure for the purpose of aiding the people in the exercise of their power to amend the constitution, a power which the people always possessed and never passed to any agency and which the general assembly never had. The other relates to limitations upon a complete power of the general assembly vested in it by the constitution, and such limitations were written at a time when statutes could be enacted and the legislative power of the state, except as to the constitution, exerted only by the general assembly. The question now under discussion does not involve the internal validity of an amendment or statute; the other involves the internal validity of statutes. Besides the question now before us is determined without reference to the fact that the limited right granted in section 2 of article XIX is in terms to the general assembly. These considerations impel us to say that the argument referred to is not pertinent to this case.

The plain affirmative declarations of section 1 of article V is contrary to the proposition advanced by plaintiff in error. He has resorted to many rules of construction in order to support his theory. Rules of construction, if applicable, prove helpful, but if not applicable they may lead astray and are not to be resorted to. When the language of the constitution is plain and unambiguous there is no room for construction. What the words declare is the meaning and courts have no right to add to or take from that meaning. *People, ex rel. v. May,* 9

Colo. 80, 10 Pac. 641. *People v. Cassidy,* 50 Colo. 503, 117 Pac. 357.

Section 1 of article V of the constitution, as it now stands, containing. the initiative and referendum provisions, does not, on its face, place upon the required percentage of voters any limitation as to the number of amendments that may be so proposed. It is said in that section that ''the people reserve to themselves the power to propose   *   *   amendments to the constitution and to enact or reject the same at the polls independent of the general assembly,'' and there is no hint or suggestion in the section that the number of such amendments that may be proposed and submitted to the people at any one election is at all limited, except as it may be limited by the provision that the proposed amendments shall be filed with the secretary of state at least four months before the election at which they are to be voted upon, and the provisions relative to the form and manner of the proposal. It affirmatively appears in the section that no limit was intended on the number that may be proposed, for it is declared therein that, ''The secretary of state shall submit all measures initiated by * * the people for adoption or rejection at the polls in compliance herewith.'' If it was intended that only a certain number should be proposed, why was the secretary of state commanded to submit all that may be filed with him? When that officer was directed in positive terms to submit all, it cannot be said that he shall submit only a certain number, and if all must be submitted it cannot be said that those above a certain number that are submitted are on that account void. No one has any right to say that the people intended that all that are proposed shall be submitted to them, but that only a certain number of those that are submitted and perhaps adopted should be valid. Again the article says: ''All elections on measures referred to the people of the state shall be held at

the biennial regular general election, and all such measures shall become the law or a part of the constitution, when approved by a majority of the votes cast thereon,'' etc.  In reading this we must do so in the light of the fact that the people always possessed the sole right to amend the constitution and never limited themselves as to the contents of amendments to it.  Taking this fact into consideration, when the section commands, as it does, that all constitutional amendments proposed in compliance therewith shall be submitted and that all submitted shall become a part of the constitution, when adopted, it seems quite clear that no limit was intended.

There is nothing in the section that in any way affects what the general assembly may do, save that, with certain exceptions, any act, section or part of any act of the general assembly may be referred to the people and by them adopted or rejected at the polls.  There is a provision in it that the ''section shall not be construed to deprive the general assembly of the right to enact any measure.''  This may not refer to the proposal of constitutional amendments, but taken in connection with the whole act it is obvious that it was not intended that the general assembly should be interfered with in its right to propose contitutional amendments.  Under the contention of plaintiff in error, the number of amendments that are proposed under the initiative may equal the number which he says can be proposed, before the general assembly has a chance to propose any, and thereby the right of the general assembly would be entirely taken away, or *vice versa,* the general assembly may propose the limited number, in which event the right of proposal under the initiative would be gone.  The section says that the power to propose constitutional amendments is reserved to the people independent of the general assembly, and there is nothing in the section that modifies this independence in any way, except that the section

shall not be construed so as to deprive the general assembly of the right to enact any measure, by reason of which the general assembly may amend or repeal any initiated law that is adopted by the people at the polls. *In Re Senate Resolution,* 54 Colo. 262, 130 Pac. 333.

What the plaintiff in error is asking this court to do is not to construe the constitution, but to amend it by construction, and this no court has the right or power to do. The argument made is based largely on the wisdom and policy of leaving the number of amendments that may be proposed by the initiative as unlimited. The wisdom or policy of that is not a judicial question, but a political one, to be fought out on the hustings, and determined by the people at the polls. The people have the sovereign right to amend their constitution if they so desire, and courts have no power to amend it for them. The briefs point out that dangers may arise from the unlimited proposal of amendments to the constitution, and seem to express a fear of the abuse which the people may make of their power. We have no right to assume such a result, for such argument, if heeded, would sweep away our present form of government. It is said in section 1 of article II of our constitution, ''That all political power is vested in and derived from the people; that all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.'' We cannot be unmindful that this court must not usurp power, or abuse its right of construction, or lose sight of the dangers which may arise, not only to the state, but to the court itself from such usurpation and abuse. It is just as important for the preservation and just administration of the government of this state that the power of courts should be exerted only within the limits of the constitution, and be not abused, as it is that the power of the people, the general assembly or the

executive department should be so exerted and not
abused.

· The plaintiff in error asserts that the Home Rule
Amendment embraces several distinct amendments, which
could not lawfully be submitted as a single amendment.
As has been seen section 2 of article XIX provides that if
more than one amendment be submitted at any general
election, each of the amendments shall be voted upon
separately, and votes thereon cast shall be separately
counted. Conceding, but not deciding, that this applies
to measures initiated, we think the objection is not well
taken. In the *Sours* case, it was determined that the con-
stitution does not require the submission of separate sub-
jects, but only that each amendment be separately sub-
mitted, and that it is one amendment if the subjects are
germane to the general subject of the amendment, or so
connected with or dependent upon the general subject
that one is not desirable without the other, even though
other articles be incidentally affected, or constructively
amended, or amended by implication. It has been de-
termined again and again that the subject matter of
article XX was Home Rule, or the right of self-govern-
ment by Denver and other municipalities in the state re-
lating to local and municipal matters. Section 6 of the
article, as it stood before the Home Rule Amendment,
gave to cities of the first and second class in this state
the power to adopt charters and to govern themselves
in relation to their local and municipal matters. The
amendment to that section deals with the same general
subject. It provides that the people of each city or town
in this state, having a population of two thousand inhab-
itants, are vested with and shall have power to make,
amend, add to or replace the charter of the city or town,
which charter shall be its organic law and extend to all
local and municipal matters. It provides that such city
or town, and the citizens thereof, shall have the powers

set out in sections 1, 4 and 5 of Article XX "and all other powers necessary, requisite or proper for the government and administration of its local and municipal matters, including power to legislate upon, provide, regulate, conduct and control." Then follow certain enumerated matters stated separately and lettered from "a" to "h." Subdivision "d" of these enumerated matters is as follows: "All matters pertaining to municipal elections in such city or town, and to electoral votes therein, on measures submitted under the charter or ordinances thereof, including the calling.or notice and the date of such election or vote, the registration of voters, nominations, nomination and election systems, judges and clerks of election, the form of ballots, balloting, challenging, canvassing, certifying the result, securing the purity of elections, guarding against abuses of the elective franchise, and tending to make such elections or electoral votes non-partisan in character."

Subdivision "g" of these enumerated matters is as follows: "The assessment of property in such city or town for municipal taxation and the levy and collection of taxes thereon for municipal purposes and special assessments for local improvements; such assessment, levy and collection of taxes and special assessments to be made by municipal officials or by the county or state officials as may be provided by the charter."

It is contended that subdivision "d," which pertains to municipal elections, does not relate to a matter of local, municipal concern, or a local municipal matter under the decision in *Mauff v. People,* 52 Colo. 562, 123 Pac. 101. That opinion was written before the adoption of the Home Rule Amendment. If it was therein declared that municipal elections were matters of state, governmental control, the people thereafter, by the adoption of the Home Rule Amendment, declared in terms that municipal elections were local and municipal matters, upon which

the people of municipalities had the power to legislate. Whatever may have been the law or the status of municipal elections before the amendment, their status now, by the adoption of that amendment, is fixed by legislative declaration of the people as local and municipal matters. The Home Rule Amendment says that the charter shall extend to all local and municipal matters and that the people may legislate concerning those matters, and enumerates specifically some of the matters which are regarded as local and municipal, among which are all matters pertaining to municipal elections and municipal taxation, and after the enumeration of these several matters, it further says: "It is the intention of this article to grant and confirm to the people of all municipalities coming within its provision the full right of self-government in both local and municipal matters, and the enumeration herein of certain powers shall not be construed to deny to such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right."

It is plain from this amendment that all matters pertaining to municipal elections specified in subdivision "d" and all matters pertaining to the assessment of property for municipal taxation, and the levy and collection of taxes therein for municipal purposes, and special assessments for local improvements, etc., specified in subdivision "g," are declared local and municipal matters, and they have been so declared by the people themselves. If they were not so before the amendment they are so now, in the towns and cities of the state, having two thousand inhabitants, whose people elect to be governed under their own charter.

Plaintiff in error also asserts that the Home Rule Amendment is subversive of the state government and repugnant to the constitution of the United States. He does not point out how and in what manner it subverts

the government, nor does he point out what particular section of the federal constitution has been violated. We presume that this is a last mention of that idea that has been advanced by those who desired to overthrow article XX of the constitution, ever since that article was adopted, and which idea has vexed the courts, not only of this state, but of many others, to-wit, that the government proposed by the Home Rule Amendment is not republican in form. We are glad to say that at last that question has been fully settled, and we trust forever so far as courts are concerned. It is a political question purely, over which courts have no jurisdiction. *Luther v. Borden,* 7 How. 1, 12 L. Ed. 581. *Pac. Tel. Co. v. Oregon,* 223 U. S. 118, 56 L. Ed. 377, 32 S. Ct. 224.

The judgment is affirmed.

*Judgment affirmed.*

Decision *en banc.*

Mr. Justice Gabbert concurs specially.

Mr. Justice White dissents.

Mr. Justice Hill not participating.

Mr. Justice Gabbert concurring specially:

If it appears that the limitation imposed by article XIX is not involved, then it is unnecessary to consider the question of whether it is binding upon the people in their legislative capacity. That this limitation was violated is based upon the assumption that prior to the time any amendment to article XX was proposed, proposed constitutional amendments to six other articles had been lodged with the secretary of state. An analysis of the measures on file when the first proposed amendment to article XX was filed shows that this contention is without foundation. At the time the first proposed amendment to article XX was filed, there had been filed with the secretary of state proposed amendments to the follow-

ing articles: two to article XI, one to article XIV, one to article X, one to article XV, one to article X and one to article XIX, or, in all, proposed amendments to five articles. The first five proposing to amend four articles were proposed by the general assembly. Next in order, as an amendment to an article there was filed a proposed amendment designated "Social Centers," which was proposed as an amendment to article XX. This proposed amendment, with those previously named, constituted in all, proposed amendments to six articles. The inhibition in section 2 of article XIX only inhibits the submission of proposed amendments to more than six articles, and does not limit the number of amendments which may be proposed to the designated number of articles. The home rule amendment, although the last filed, was proposed to article XX, consequently it does not fall within the constituted restriction mentioned, except as it might be a proposed amendment to an article after six amendments to other articles had been proposed. Prior to the time the several amendments mentioned had been proposed there had been filed a proposed new article, number XXI, generally referred to as the state-wide prohibition amndment, and prior to the filing of the proposed amendment to article XIX, there was filed an initiated measure, relating to the publication of initiated laws. It is only by including both of these measures as proposed constitutional amendments falling within the restriction of article XIX that it is sought to show that, prior to the first amendment proposed to article XX, amendments to six articles had been proposed. The initiated measure relating to the publication of initiated laws was clearly a statute. It was initiated, submitted and voted upon in that form, and cannot therefore be regarded anything more than a proposed statute, although it might have been unconstitutional if adopted. As aptly said by the chief justice, in substance, to say that the people, by an

initiated measure designated a statute, could unwittingly amend their constitution is a proposition which refutes itself.

By section 19, authority to propose amendments to the constitution is conferred in the broadest possible terms. The only restriction imposed is that amendments shall not be proposed to more than six articles. If this limitation applies to both the people and the general assembly combined in proposing amendments, it has not been violated. It does not inhibit the proposal of an amendment by way of a new article. Except as limited by article XIX, if applicable to the people, their power is plenary, and when a new article is proposed by them the only question necessary to consider, in the circumstances of this case, is whether the changes which may thereby be effected in other articles are germane and only incidental to the object sought to be accomplished by the proposed new article. In other words, the constitutional inhibition relied upon by counsel for plaintiffs in error only limits proposed amendments to articles, and not to a proposed new article containing only provisions strictly germane to its expressed purpose, even though it may modify and effect existing articles. In the *Sours* case it was conceded that more than six articles of the constitution were affected by article XX; but as it was a new one, having one comprehensive and special object, it was held that the changes it worked in the organic law of the state were mere incidents of the main purpose of the amendment, and hence did not amend the constitution in the sense it was the purpose of the limitation imposed by article XIX to inhibit. The only constitutional provision which proposed article XXI could have affected is section 5 of article XVIII, relating to spurious and drugged liquors. The purpose of article XXI was the prohibition of the manufacture, sale or importation of spirituous, malt and vinous liquors within or into this

state. In this respect it proposed to introduce an entirely new feature into the constitution. To what extent this amendment, if it had been adopted, might have changed or modified section 5 of article XVIII is immaterial, as it is evident that any such change or modification would have been only incidental to the expressed main purpose of article XXI, and therefore would not have been within the constitutional limitation relating to the number of articles to which amendments may be proposed. The writer therefore concludes, that as the proposed article XXI was an entirely new one, which, if it had been adopted, would not have amended or changed any other article, except incidentally, that in determining the number of proposed amendments to articles, article XXI must be eliminated, and that the proposed statute referred to cannot be counted. For this reason the question of whether the people, in their legislative capacity, are limited in the number of constitutional amendments to articles which they may propose to be voted upon at any one time is not involved and should not be considered or determined, as it is apparent that the amendments proposed to article XX, in connection with those previously proposed, only constituted proposed amendments to six articles. Article XX was included in the first six articles which it was proposed to amend, and the proposed amendments thereto were therefore validly proposed, insofar as the constitutional limitation invoked by plaintiffs in error is involved. The other objections urged against it necessary to consider are clearly without merit, and the writer concurs in the affirmance of the judgment, without expressing any opinion on the question of whether or not the amendment, usually referred to as the initiative and referendum, removed all constitutional restrictions on the authority of the people to propose constitutional amendments.

The views herein expressed are limited to the facts

presented, and must not be understood as intended to be applicable to a case where it was manifest that a proposed new article was resorted to as a mere guise to avoid the constitutional limitation considered, or where, by a new article or articles, it was sought to change the entire plan of government as outlined by the constitution and in effect substitute a substantially new one.

Mr. Justice White dissenting:

The decision of the court disposes of the matters involved in this case by holding that an amendment to section 6 of article XX of the constitution, called the "Home Rule Amendment," submitted at the general election in 1912, was legally adopted and embodied in the constitution. My associates, participating herein, think and hold that the proposed amendment is valid, and I am equally certain it is not. Neither they nor I express approval or disapproval of the system of municipal government for which the Pueblo charter provides. With that, as members of the court, we have no concern. Whether that government can be sustained upon any theory, I express no opinion, but shall briefly state the reasons why I think the Home Rule Amendment was not legally submitted and adopted.

The Home Rule Amendment purported to amend section 6 of article XX of the constitution. Another proposed amendment to the same article had been previously filed. But it is conceded that at the time the first proposed amendment to the article was filed, there had been filed with the secretary of state proposed amendments to five other specifically enumerated articles, and also, at least, one proposed amendment to the constitution designated as a new article. This did not include the alleged statute to which reference is made in the opinion of the court. It did include the proposed new article referred to therein as the State Wide Prohibition Amendment. Therefore, if an amendment to the constitution, by way of

a new article added thereto, comes within the limitation as to the number of amendments the general assembly may propose at any one session, and the people acting under the initiative and referendum are likewise so limited, the power to propose amendments had been exhausted before any proposed amendment to article XX had been filed with the secretary of state. I assert the affirmative of both propositions.

Mr. Justice Gabbert's concurring opinion is placed upon the ground that a new article added to the constitution does not come within the limitation imposed upon the general assembly by section 2 of article XIX of the constitution. The majority opinion, by chief justice Musser, rather confirms that view but declines to expressly so hold, and rests the decision of the court upon the ground that no limitation exists as to the number of amendments which may be proposed and enacted by the people under the initiative and referendum amendment.

This court has heretofore expressly held that a new article sought to be added to the constitution, comes within the limitations as to the number of amendments that may be proposed by the general assembly at any one session. In *People v. Sours,* 31 Colo., 369, 74 Pac. 167, 102 Am. St. 34, Mr. Justice Steele, pp. 391, 392, (concurred in by Mr. Justice Gabbert, p. 411), said:

"In the constitution itself there is no limitation as to new articles. It provides that any amendment or amendments may be proposed by the general assembly, and, when ratified by the people, shall become a part of the constitution; the only limitation being that the legislature shall have no power to propose amendments to more than one article at the same session. The argument advanced by the relator to the effect that, there being no limitation upon the legislature concerning new articles or subjects, it has plenary power, is convincing, and he has raised in our mind a doubt as to the meaning of the

section; and if this contention corresponded with the legislative interpretation, we should resolve the doubt in favor of the construction thus contended for. But we are inclined to accept the construction placed upon the constitution by the legislature. In the legislature of 1901, that proposed this amendment, there were twenty-one senators who were members of the senate that proposed the amendment authorizing six amendments, and they appear to have placed the construction upon their work which prohibits the submission of more than six amendments to the constitution, whether the amendments are to be considered as new articles or as amendments to articles of the constitution as it then existed; and there is abundant authority, not only in this state but in every other state of the Union, to the effect that contemporaneous construction by the legislature of a doubtful or ambiguous provision of the law or constitution should have great weight with the courts.''

In order that there be certainty in government and orderly procedure, this court should not overturn that decision. But, aside therefrom, such holding in that respect is right upon principle, irrespective of the legislative construction. The very purpose of the amendment, which I will hereinafter consider, forces that conclusion.

While all political power is vested in the people, it does not, unlimited and undirected, constitute government. Government is such power controlled and modified in its action through a system of rules, principles and ordinances made or adopted by the people. With us these fundamental rules are embodied in a written constitution which defines the different departments of the government, confers on each the powers and duties to it allotted, and limits the powers of all. It declares that the people of the state, under their inherent power, may, subject to the limitations of the federal constitution, alter and abolish their constitution and form of govern-

ment whenever they may deem it necessary to their safety and happiness, but with equal certainty it prescribes the only lawful manner in which this supreme power may be exercised. Under the provisions of the constitution the voice of the people, acting in their sovereign capacity, can be of legal force only when expressed at the times and under the conditions therein prescribed. The people can legally do no act in altering the constitution or abolishing the form of government, except in the manner and under the conditions which they themselves have prescribed and established by the constitution. This fundamental principle is forcibly expressed in *McBee v. Brady,* 15 Idaho, 761, 775; 100 Pac., 97, where it is said:

"The constitution is the fundamental law of the state. It received its force from the express will of the people, and in expressing that will the people have incorporated therein the method and manner by which the same can be amended and changed, and, when the electors of the state have incorporated into the fundamental law the particular manner in which the same may be altered or changed, then any course which disregards that express will is a direct violation of that fundamental law. These provisions having been incorporated in the constitution, where the validity of a constitutional amendment depends upon whether such provisions have been complied with, such question presents for consideration and determination a judicial question, and the courts of the state are the only tribunals vested with power under the constitution to determine such questions."

The principle is likewise well stated in the following: *Jameson on Constitutional Conventions,* p. 581; 6 Amer. & Eng. Encyc. of Law (2d ed.) p. 904. And as said by Judge Cooley, in his work on Constitutional Limitations, p. 747:

" * * and if by any portion of the people, however large, an attempt should be made to interfere with the

regular working of the agencies of government at any other time or in any other mode than as allowed by existing law, either constitutional or statutory, it would be revolutionary in character, and must be resisted and repressed by the officers, who for the time being, represent legitimate government.''

Keeping in mind these principles, let us consider the state of the constitution at the time it was amended by embodying therein the initiative and referendum. The sovereign power of the people, in establishing their constitutional government, prescribed therein the mode and instrumentalities by and through which they would change, modify or abolish the same. They divided the inherent power of government into three distinct departments—the legislative, executive and judicial. They vested the legislative power in the general assembly, sec. 1, art. V, const. And as the making of constitutions or constitutional amendments is essentially a legislative function, the language, unmodified by other provisions of the constitution, might properly be held to lodge in that entity the ultimate sovereignty of the body politic. The fundamental law, however, provides no mode of procedure whereby that agency can exercise such supreme power. On the contrary, that instrument, as it existed prior to the adoption of the initiative and referendum amendment, prescribed, in article XIX, the only modes of procedure by which any change or changes therein could be legally effected. Thus the constitution having made provision for its own amendment, change or abolishment, the modes therein prescribed were exclusive. *Cooley's Const. Lim.*, (6th ed.), p. 42. Therefore, the making of constitutions, the abolishment thereof, or amendments thereto, was not delegated but reserved exclusively in the people, and can be exercised only by their direct action.

The people recognized, however, that, as the first step

in either constitutional or statutory legislation is the formation and proposal of measures, it was necessary to constitute or make provision for instruments or agencies for that purpose. Accordingly in article XIX they prescribed the means by which any changes in their fundamental law might be proposed. Therein and thereby they necessarily limited the exercise of their inherent power to govern. In their sovereign capacity they bound themselves to make no changes in the organic law, except such as might be proposed by a constitutional convention which they might call and the members of which they had elected for that purpose as prescribed in section 1 of article XIX, or by the general assembly as prescribed in section 2 thereof. In the latter section they ordained that the general assembly, entrusted with the power of ordinary legislation, should never propose amendments to more than six articles at the same session, but a constitutional convention, called and convened by the people for the particular purpose of proposing changes in the fundamental law as prescribed in section 1 of the article, could prepare and propose any changes by it deemed necessary.

Thus provision was made for two agencies that might propose changes in the fundamental law: one, the constitutional convention, unlimited, except by the restrictions of the federal constitution, in the character of changes that it might propose even to the extent of abolishing the constitution and form of government; the other, the general assembly, limited to the proposal of amendments, and restricted in the number that might be proposed at any one session. Neither of these agencies are empowered to make such changes. That power, as before stated, resides in the people alone. The procedure prescribed, therefore, necessarily constitutes limitations not only upon the agencies of government, but also upon the power of the people to govern as they will. In other words, the limitations of article XIX, though ex-

pressed as to the agencies therein authorized to propose
new constitutions, or systems of government, or amend-
ments thereto, are likewise, of necessity, limitations upon
the power of the people.  By the mode of procedure pre-
scribed, the people inevitably bound themselves not to
change more than six articles of their organic law at any
one time, unless through a constitutional convention.
The manifest purpose thereof was to prevent the sub-
mission at one election of a great number of amendments
to the organic law, or a substantial and far-reaching
change thereof, unless the same had been moulded into
shape by a constitutional convention, the agency carefully
chosen by the people for that particular purpose.  The
clause: ''But the general assembly shall have no power
to propose amendments to more than six articles of this
constitution at the same session'' was not written in the
constitution for the benefit of the general assembly, but
for the protection of the people.

Bound by the restriction that they would not change
more than six articles of their constitution at any one
time, except through the convention method, the people
in 1910, created, by amending section 1 of article V of the
constitution, other agencies authorized to propose changes
therein by amendment.  The section, as amended, still vests
the legislative power of the state in the general assembly,
but reserves to the people ''the power to propose laws and
amendments to the constitution, and to enact or reject the
same at the polls independent of the general assembly.''
The section then prescribes, *inter alia,* a mode by which
the power to propose laws and amendments to the con-
stitution may be exercised, requiring at least eight per
cent. of the legal voters to propose any measure.  As the
general assembly never possessed power to amend, change
or abolish the constitution, but only to propose amend-
ments thereto, and the people always had the sole power
to enact constitutional amendments or new constitutions,

or abolish the same, it is clearly evident that the power reserved as to amendments to the constitution is solely the power to propose such amendments, and the power to enact has reference to ordinary laws only, the enactment of which was previously vested solely in the general assembly. And as the power to propose changes in the fundamental law by eight per cent. of the legal voters is limited to the proposal of amendments thereto, it is essentially the same power that is vested in the general assembly by virtue of section 2 of article XIX of the constitution and differs materially from the unlimited power, in that respect, vested in a constitutional convention under the provisions of section 1 of article XIX. While these new agencies authorized to propose constitutional amendments, thus created, were empowered to do the acts enumerated ''independent of the general assembly,'' it does not follow that they were authorized to go further in the performance of the acts than the only other agency was permitted to go in the performance of the same acts. They are created by the people in their sovereign capacity, invested with the same power as to this subject, and are necessarily co-ordinate. The people having invested them with the same power, one would naturally presume it was intended to subject them to the same limitations and restrictions as to the exercise of the power, unless the contrary clearly appears. This would seem to be the logical view of the matter. Especially is this true when in the same instrument the people have made provision for the bringing into existence of other agencies, to-wit, constitutional conventions, not limited to the proposal of amendments to the constitution, but invested with full power to propose new constitutions or any changes in the fundamental law.

It is elementary that the intention of a single clause in the constitution or any law can not be ascertained solely from the words employed therein. The whole in-

strument must be examined with a view of ascertaining the meaning of each and every part, and, whenever possible, be construed so that it shall harmonize with all other parts without distorting the meaning and effect of any provision. 8 Cyc., p. 730. And the intent of the framers thereof when ascertained, will prevail. The intent, however, "is to be ascertained, not alone by considering the words of any part of the instrument, but by ascertainig the general purpose of the whole, in view of the evil which existed calling forth the framing and adopting of such instrument, and the remedy sought to be applied; and when the intent of the whole is ascertained no part is to be contrued so that the general purpose shall be thwarted, but the whole is to be made to conform to reason and good discretion." Cyc, *supra,* p. 731.

If it was intended, by the initiative and referendum amendment, that the people, acting through agencies of eight per cent. of their number, might submit proposed changes in the constitution without reference to the number proposed at one election, it necessarily follows that the limitation upon the power of the general assembly to propose amendments to not more than six articles at any one session has no substantial effect whatever. As the people alone possess the power to enact constitutional amendments, it could make no difference, except possibly as to previous consideration of the proposed amendments, whether the amendments submitted are proposed by not less than eight per cent. of the electors or by the general assmbly. On the other hand, if there was no intention to overthrow the policy established by article XIX, limiting the number of amendments to the constitution which may be submitted at any one election, except through the convention method, to six, the several parts of the constitution harmonize with each other and the meaning and effect of no part thereof is distorted.

Moreover, in construing a constitutional amendment it must be presumed that the people did not intend to make any change in the existing instrument beyond what is expressly declared, and if an amendment is couched in general terms there is a presumption that there was no intention "to depart from any established policy" nor "to innovate upon fundamental principles." *Lewis' Sutherland Stat. Const.* § 333, *Slaughter-House Cases,* 16 Wall, 36, 78, 21 L. Ed. 94.

And "general words are not to be so construed as to alter the previous policy of the law, unless no sense or meaning can be put upon them consistently with the intention of preserving the existing policy untouched. *Lewis' Sutherland Stat. Const.,* § 581, *Minet v. Leman,* 20 Beav., 269, 278.

Therefore, under the settled rules of construction, there is not the slightest basis for the inference that it was intended to effect, by the initiative and referendum amendment, such a radical departure from the established policy of article XIX of the constitution as results from the decision of this court. Moreover, the reasons upon which that policy was founded are as cogent now as before the adoption of the initiative and referendum amendment. Amendments proposed by the general assembly have the merit, at least, of being the product of the open deliberation of a public representative body selected from every part of the state by the electorate thereof; while amendments proposed under the initiative and referendum are the product of private conferences of limited numbers of more or less interested citizens of particular localities. If, then, it was unwise formerly to permit the change of more than six articles at any one time, except through the convention method, it is too plain for argument that it would be infinitely more unwise to do so now. While the wisdom of an amendment to the constitution is directed to, and must be determined solely by, the legis-

lative power, and not by the judicial, the latter, however, in constructing such measure should not place an interpretation thereon that would render it unwise in policy and far-reaching in its evil effect, when the language used in its association with other language of the whole instrument of which it forms a part, warrants a construction consistent with the established policy and in no sense innovating upon fundamental principles.

Besides, it is common knowledge that the initiative and referendum amendment was adopted because, it was claimed, the general assembly had become no longer responsive to the wishes and will of the people. It was said that many laws desired by the people, and within the constitutional power of the general assembly to enact, were refused proper consideration and passage, and necessary constitutional amendments not proposed. No complaint was made that the general assembly could not propose a sufficient number of amendments to be voted upon at any one election, or that it could not enact proper laws within the constitutional limitations placed upon it. What was desired was to enable the people to enact laws and propose amendments which the general assembly could enact and propose but did not, and it was not intended to confer greater power upon the people acting under the amendment than that possessed by the general assembly, so as to enable the former to enact laws or propose amendments which the latter could not enact or propose. Section 1 of article V, as amended, vests the legislative power in the general assembly, but of this power it reserves in the people the right "to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly." While there is nothing in the language expressly limiting the power of the people with respect to proposing amendments to the constitution, the same is equally true relative to the power of the people to propose and enact any law.

No distinction in the premises is made in the language, and none should be read therein by the court. Therefore, if the constitutional limitation upon the power of the general assembly, as to the number of articles of the constitution to which it may propose amendments, is not obligatory upon the people when, through their other designated agencies, the same function is being performed, clearly limitations upon the power of the general assembly, as to the character of laws it may enact, are not binding. But this would be inconsistent with the theory of constitutional government, for it presupposes limitations upon all governmental power. From time immemorial certain classes of legislation have been uniformly prohibited in constitutional governments. In this state, as in most states of the Union, instead of placing the limitation upon the laws that might be enacted, it is placed upon the agency entrusted with the duty of enacting the laws. Thus it is declared in the constitution that, "the general assembly shall have no power to propose amendments to more than six articles of this constitution at the same session," article XIX, section 2; that, "the general assembly shall pass no *ex post facto* law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities," article II, section 11; that "the general assembly shall pass no local or special laws" in many enumerated cases, article V, section 25. It also provides, article XV, section 12, that "the general assembly shall pass no law for the benefit of a railroad or other corporation," etc. And in article XVIII section 2, it declares that, "the general assembly shall have no power to authorize lotteries or gift enterprises for any purpose," etc.

Clearly, laws proposed and enacted by the people under the initiative clause of the amendment are subject to these and other constitutional limitations, though the

limitations are expressed as against another agency entrusted with the like power of legislation. Equally is this true as to constitutional amendment proposed and enacted by the people under the same amendment. Nor can I conceive that this conclusion is in any sense militated against by the asserted inapplicability in the majority opinion of this line of argument. The pronouncement of a court that a certain line of argument is eliminated is always effective, but not necessarily convincing. The elimination in the case before us is predicated upon an alleged distinction between the character of power exercised by the general assembly when proposing constitutional amendments and when enacting general legislation, and for the further alleged reason that the proposal of a constitutional amendment does not involve its internal validity. In any event, it is the power of the people to govern as they will, acting through either agency, and the constitutional prohibition operates upon all agencies in the exercise of the same power, and whether a thing constitutionally required involves the internal validity of an act, is of no consequence. *Lewis' Sutherland Stat. Construction,* § 333. The introduction of a bill into the general assembly within the first thirty days of the session, or the signing of the same by the proper officers, does not affect its internal validity. Nevertheless, they are required by the constitution, and without them the alleged law has no force and effcet.

Neither am I able to appreciate the holding, that by reason of the requirement in the initiated amendment, "that the secretary of state shall submit all measures initiated by * * * the people for adoption or rejection at the polls in compliance herewith," it is shown that no limit was placed on the number of amendments that may be proposed by the people through the initiative. The very words of the provision negative that

deduction. The amendment is in the constitution and the measures to be submitted must be in conformity with that instrument. Moreover, the language requiring the secretary of state to submit the measures initiated thereunder is substantially the same as the language in section 2, article XIX, requiring the publication by the secretary of state of amendments proposed by the general assembly. No court has had the temerity to hold that an amendment, though favorably voted upon by the people, but proposed by a general assembly in excess of the constitutional limitation as to the number it might propose, could thereby become a part of the fundamental law.

The power to legislate directly by the initiative or referendum has been embodied in but few constitutions, and consideration thereof by the courts has been infrequent. However, the few cases in which like amendments have been considered, announce the same principles and are in accord with the view I herein express. In *Hodges v. Dawdy* (Ark.), 149 S. W. 656, 659, it is said:

"The constitutional amendment, whereby the people of the state reserve to themselves the power to legislate directly by the initiative or referendum, does not abrogate the existing constitution and laws of the state, except such provisions as are necessarily repugnant thereto. * * * The amendment being the last expression of the popular will in shaping the organic law of the state, all provisions of the constitution which are necessarily repugnant thereto must, of course, yield, and all others remain in force. It is simply fitted into the existing constitution, the same as any other amendment, displacing only such provisions as are found to be inconsistent with it. * * * In the construction of its terms, and in the determination of its scope and effect, the court should follow settled rules of interpretation."

While in *Kadderly v. Portland,* 44 Ore. 118, 146, 74 Pac. 770, 75 Pac. 222, it is said: "Laws proposed and enacted by the people under the initiative clause of the amendment are subject to the same constitutional limitations as other statutes."

And in *State v. Roach,* 230 Mo. 408, 436, 130 S. W., 689, 695, 139 Am. St. 639, it is declared that, "The rules and principles applicable to the submission of constitutional amendments to the voters of this state are applicable alike to amendments proposed to the constitution under the initiative and referendum amendment or amendments to the constitution by the general assembly of this state."

Indeed, the Supreme Court of Arkansas has ruled in *State v. Donaghey* (Ark.), 152 S. W. 746, the precise question here involved. At the time of the adoption of the amendment in that state, providing for the initiative and referendum, its constitution contained, and now contains, a provision in substantial effect the same as ours, but limiting the number of amendments to the constitution which could be submitted at any one election to three. The general assembly proposed two amendments and the people, by petition, proposed several others. The secretary of state submitted all proposed and they were voted upon by the people. A question arose as to the validity of an amendment submitted in excess of the limitation prescribed. It was held that the limitation applied to the people under the initiative, as well as to the general assembly, the court ruling:

"The people can now exercise this power of amendment through either of two agencies, the general assembly, or upon initiative petitions of 8 per cent. of the legal voters; but they cannot exercise it through either agency otherwise than in accordance with the provisions and limitations of the constitution, which apply alike to both and limit the number of amendments that can be

proposed or submitted at the same time, through either or both agencies or three. It is the people acting, in any event, through either agency, and the constitutional prohibition operates alike upon both. They will not be engaged or disturbed with considering more than three amendments at the same time, without regard to what agency proposes or submits them. The General Assembly having proposed two amendments to the Constitution, numbered 11 and 12, and the voters having by initiative petition proposed another numbered 13, making three in all proposed for submission at the same time, before the filing of the petition proposing said amendment No. 15, it was attempted to be submitted in violation of the Constitution and could not therefore have been adopted.''

However, a further cogent reason exists for the construction for which I contend. At the general election in 1912 an amendment to section 2 of article XIX of the constitution was submitted, under the initiative, and was defeated by vote of the people at the polls. The principal purpose of that proposed amendment was to reserve in the people the power to propose an unlimited number of amendments to the constitution to be voted upon at any election. In that respect it read as follows: ''The general assembly shall have no power to propose amendments to more than six articles of this constitution at the same session. The people may propose as many amendments at any election as they may see fit, including the election at which this amendment is voted upon.'' The fact that this amendment was proposed under the initiative, coupled with the further fact that it was defeated by the people at the polls, should constitute a conclusive presumption against that construction which permits the people to act without limitation in proposing amendments to the fundamental law. It was a practical construction, by the very agency

authorized to propose amendments, that such power does not exist under the constitution. Moreover, no court should hold by construction that to be the fundamental law of the state which the people have voted upon and declared shall not be expressly written into their constitution.